IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEFFREY HETH, | ) |
| Plaintiff, | ) |
| | ) No. 19-cv-01096 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| ADEYEMI FATOKI, et al., | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jeffrey Heth was a pretrial detainee at the LaSalle County Jail ("Jail"). Heth claims that medical staff at the Jail failed to treat his wounds from his severe skin condition properly, prematurely removed him from medical observation although he still suffered from heroin withdrawal symptoms, and belatedly sent him to the hospital for emergency medical attention despite him exhibiting signs of septicemia. Consequently, he has sued Dr. Adeyemi Fatoki, Dr. Rozel Elazegui, and Nurse Carmen Clapp (collectively, "Defendants") under 42 U.S.C. § 1983, alleging that they were deliberately indifferent to his serious medical needs in violation of his Fourteenth Amendment rights. Before the Court is Defendants' motion for summary judgment. (Dkt. No. 132.) For the following reasons, Defendants' motion is denied.

BACKGROUND

Unless otherwise noted, the following facts are undisputed.

Heth was a pretrial detainee at the Jail from May 25, 2018 to June 2, 2018. (Pl.'s Resp. to Defs.' Statement of Facts ("PRDSF") ¶ 1, Dkt. No. 144.) Prior to his arrest, Heth used heroin daily. (*Id.* ¶ 6.) As a result, Nurse Clapp, the Jail's former Health Services Administrator, placed Heth on an opiate withdrawal protocol after she assessed him on May 25. (*Id.* ¶¶ 5–6.) At the time

of his admission to the Jail, Heth appeared to Nurse Clapp to be cooperative and psychologically normal. (Defs.' Resp. to Pl.'s Statement of Additional Facts ("DRPSAF") ¶ 9, Dkt. No. 149.) That said, Heth also had open wounds on his legs and arms related to his intravenous drug use, so Nurse Clapp obtained physician orders from Dr. Fatoki for wound cleansing and to send Heth to the hospital on May 25. (PRDSF ¶¶ 7–9; DRPSAF ¶¶ 8, 12.) According to Heth, he had developed necrotizing fasciitis, which is an infectious disease that causes open wounds to form around the body. (DRPSAF ¶ 1.) On the same day, Heth returned from the emergency room to the Jail because his veins were too damaged for intravenous antibiotics. (DRPSAF ¶ 13.) Thereafter, Dr. Fatoki directed that Heth receive oral antibiotics and start a daily wound-dressing regimen. (PRDSF ¶ 21; DRPSAF ¶ 13.)

During his time at the Jail, Heth received care from a wound care specialist. (PRDSF ¶¶ 22–23.) To monitor Heth's opiate withdrawal progress, the Jail's medical staff also used the Clinical Opiate Withdrawal Scale ("COWS") protocol form from May 26, 2018 to May 31, 2018. (PRDSF ¶ 10; DRPSAF ¶ 14.) The COWS system tracks a patient's physical and mental condition by measuring several factors, including resting pulse rate, gastrointestinal upset, anxiety or irritability, and bone or joint aches; scores are taken twice per day. (DRPSAF ¶¶ 14–15.) The maximum COWS score is 48. (PRDSF ¶ 11.) And the COWS score form provides that if a patient's score exceeds 12, the patient should be scheduled for a visit with the healthcare provider on the next clinic day or sent to the emergency room for evaluation if the next clinic day is more than 24 hours later. (DRPSAF ¶ 16.) Similarly, the form also states that a healthcare provider should be contacted if the patient's resting pulse rate is less than 60. (*Id.* ¶ 17.) The form further directs staff to discontinue COWS monitoring if the patient's COWS score is less than 12 for 6 scores or for 72 hours. (*Id.* ¶ 18.) Heth views the directions in the COWS score form as required

2

company policy; Defendants, by contrast, assert that a nurse's decision whether to send a patient to a physician is based on the professional judgment of the evaluating nurse, regardless of the directions in the COWS form. (*Id.* ¶¶ 16, 19, 21.)

On May 26, Heth's COWS score was 16; nevertheless, the Jail's nursing staff did not schedule him for an appointment with a physician within the next 24 hours or send him to an emergency room. (*Id.* ¶ 19.) However, Heth did receive wound care that day. (PRDSF ¶ 23.) On May 29, Heth had a resting pulse rate of 58 but nursing staff never contacted a physician. (DRPSAF ¶ 21.) On May 30 and May 31, Heth's COWS scores were 18 and 2, respectively. (PRDSF ¶ 11.) Further, on May 31, Heth visited an external wound clinic, where the wound care provider directed that Heth have his wound dressing changed twice per day going forward. (DRPSAF ¶ 25.) Yet, according to Heth, the Jail's medical staff only changed his wound dressings once (rather than twice) on May 31 and June 1. (*Id.*) On the other hand, Defendants claim that medical staff conducted daily monitoring of Heth's wounds and that there was no failure to provide Heth with appropriate wound dressing changes. (*Id.*) According to Defendants, Heth had normal vital signs on May 28, May 29, May 30, and May 31. (PRDSF ¶ 24.)

On June 1, Dr. Elazegui, the Jail's field physician, ordered that Heth be removed from medical observation and the COWS protocol. (DRPSAF ¶¶ 5, 26.) But Dr. Elazegui further directed that Heth receive continued wound care, such as wound dressing changes and antibiotics, and that he remain in the medical cell due to his wounds. (PRDSF ¶¶ 29–30.) The parties dispute the extent to which the Jail's medical staff followed the COWS protocol and whether Heth was appropriately removed from that protocol. (*Id.* ¶¶ 10, 12, 30.) While Defendants assert that Heth was appropriately removed from the COWS protocol due to his normal vital signs and lack of

3

other symptoms, Heth disagrees because his COWS scores were not consistently at safe levels. (*Id.* ¶¶ 12, 30.)

On June 2 at 9:15 a.m., Nurse Clapp assessed Heth and observed that he still had extensive open wounds, was unable to identify the time and place, had rapid and slurred speech, had unequal pupil size, and was hallucinating. (DRPSAF ¶ 29; PRDSF ¶ 14.) After Nurse Clapp consulted via telephone with Dr. Fatoki, the former Senior Regional Medical Director for Correct Care Solutions, LLC ("Correct Care"), Dr. Fatoki ordered that Heth be monitored and placed in a safety cell as a precaution. (DRPSAF ¶¶ 3, 30.) Dr. Fatoki also noted that if Heth's mental status continued to decline, he might need to be sent to the emergency room. (*Id.* ¶ 30.) Heth and Defendants dispute whether Heth was monitored between 9:15 a.m. and 2:50 p.m. (*Id.* ¶ 32.) But at 2:50 p.m., a nurse at the Jail noticed that Heth was unable to walk without assistance and had garbled speech; she then reported Heth's condition to Dr. Fatoki and another physician. (DRPSAF ¶ 29; PRDSF ¶ 17.) Dr. Fatoki subsequently ordered Heth to be transferred to an emergency department. (DRPSAF ¶ 29; PRDSF ¶ 17.) Four days into his hospitalization, Heth had to be intubated. (DRPSAF ¶ 34.)

Heth and Defendants have offered testimony from expert witnesses regarding the reasonableness of Heth's medical treatment at the Jail. Defendants' expert, Dr. Thomas Fowlkes, Medical Director of the Lafayette County Detention Center, opines that the applicable standard of care did not require the Jail's medical staff to send Heth to the hospital on the morning of June 2; instead, he asserts that it was appropriate for medical staff to continue to monitor Heth from the medical observation cell. (PRDSF ¶¶ 35–36, 38.) Additionally, Dr. Fowlkes opines that Heth's outcome at the hospital would have remained the same, regardless of whether medical staff sent him to the hospital at 9:15 a.m. or 2:50 p.m., because his intubation was necessitated by free air in

4

his peritoneal cavity and, in Dr. Fowlkes's view, the free air was unrelated to Heth's wounds. (*Id.* ¶¶ 37, 39–40.) Moreover, Dr. Fowlkes concludes that Heth's hospital discharge records show that he was not suffering from sepsis. (*Id.* ¶ 41.)

Defendants' second expert, Nurse Kathryn Wild, a retired registered nurse with experience in correctional facilities, opines that the Jail's nursing staff conducted Heth's COWS assessments satisfactorily. (*Id.* ¶¶ 42, 45.) According to Nurse Wild, nurses may use their nursing judgment to determine whether a patient needs to see a physician following an elevated COWS score, regardless of the written policy. (*Id.* ¶ 47.) In Nurse Wild's view, it was appropriate for medical staff to send Heth to the hospital when there was a clinical change in Heth's presentation on the afternoon of June 2. (*Id.* ¶ 49.)

Heth's expert, Nurse Denise Panosky, a registered nurse, opines that Nurse Clapp was deliberately indifferent to Heth's medical needs because she disregarded company protocols, including failing to send Heth to the emergency room and failing to contact a physician when Heth's COWS scores exceeded 12 and his resting pulse rate dropped below 60. (DRPSAF ¶ 35.) Nurse Panosky also asserts that Nurse Clapp ignored symptoms that any registered nurse would have recognized as indicative of a serious risk of death. (*Id.* ¶ 36.)

Heth's second expert, Dr. Gagandeep Goyal, opines that Dr. Elazegui's decision to remove Heth from COWS monitoring was a deliberate, incorrect decision to deviate from the company's COWS protocol, especially considering Heth's deteriorating mental state. (*Id.* ¶ 38.) Further, Dr. Goyal concludes that Dr. Fatoki's failure to send Heth to the hospital on the morning of June 2 amounted to deliberate indifference because any physician would have identified Heth's worsening symptoms as associated with a significant risk of death. (*Id.* ¶ 39.) According to Dr.

5

Goyal, Heth would not have required endotracheal intubation if the Jail's medical staff had sent him to the hospital on the morning of June 2. (*Id.* ¶ 40.)

## DISCUSSION

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). While facts and reasonable inferences are construed in the light most favorable to the non-moving party, "[the Court's] favor . . . does not extend to drawing inferences that are supported by only speculation or conjecture." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal quotation marks omitted). The Court grants summary judgment when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).

Heth claims that Defendants acted with deliberate indifference to his serious medical needs in violation of his rights under the Fourteenth Amendment. "Protections for pretrial detainees under the Fourteenth Amendment are at least as great as the Eighth Amendment protections available to a convicted prisoner." *Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008) (citation omitted). A pretrial detainee's claim for inadequate medical care pursuant to the Fourteenth Amendment's Due Process Clause, however, is specifically evaluated under an

objective reasonableness standard. *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018). To establish a claim for inadequate medical care, the plaintiff must show that:

> (1) there was an objectively serious medical need; (2) the defendant committed a volitional act concerning the [plaintiff's] medical need; (3) that act was objectively unreasonable under the circumstances in terms of responding to the [plaintiff's] medical need; and (4) the defendant acts purposefully, knowingly, or perhaps even recklessly with respect to the risk of harm.

*Gonzalez v. McHenry County*, 40 F.4th 824, 827–28 (7th Cir. 2022) (internal quotation marks and citation omitted).

For purposes of summary judgment, Defendants focus their argument on Heth's evidence with respect to the third element of his claim: they contend no reasonable jury could find that any Defendant's actions toward Heth leading up to and including June 2, 2018 was objectively unreasonable.[1] Alternatively, Defendants seek summary judgment regarding Heth's request for punitive damages, arguing that there is no evidence that any Defendant had the requisite mental state for punitive damages.

### I. Objective Unreasonableness

Defendants contend that no reasonable jury could conclude that Defendants' medical treatment of Heth was objectively unreasonable under the circumstances such as to support a finding of deliberate indifference. Specifically, Defendants first argue that there is no genuine dispute that, throughout his time at the Jail, Heth received appropriate medical care for his

---

[1] As a preliminary matter, Heth urges the Court to find that Defendants have waived any argument for summary judgment on his deliberate indifference claim because their motion and opening brief lack meaningful legal analysis. Indeed, the Seventh Circuit has consistently held that "[p]erfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived." *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) (citation omitted) (concluding that a plaintiff waived its argument regarding a motion for reconsideration because the plaintiff's opening brief only contained two sentences about the motion, with no citations and thin argument). Here, however, Defendants have pointed to sufficient legal authority and record evidence to support their request for summary judgment. Accordingly, the Court rejects Heth's waiver argument.

wounds and heroin withdrawal symptoms, including wound cleansing and dressing changes, oral antibiotics, and monitoring via the COWS protocol. Second, Defendants assert that the decision to remove Heth from the COWS protocol was proper, in light of Heth's lack of symptoms and normal vital signs. Third, Defendants claim that the decision to monitor Heth for additional symptoms on June 2, 2018, rather than immediately transfer him to the hospital, was an appropriate exercise of professional judgment considering the totality of the circumstances. And fourth, Defendants contend that Heth did not suffer harm from any delay in medical treatment on June 2. For all their arguments, Defendants rely on Dr. Fowlkes's and Nurse Wild's expert testimony, emphasizing that both experts concur with their treatment decisions.

Generally, medical professionals have discretion in their treatment choices. *Johnson v. Dart*, No. 20-CV-0113, 2022 WL 17404499, at *4 (N.D. Ill. Dec. 2, 2022). With respect to nurses, while they "may generally defer to instructions given by physicians, they have an independent duty to ensure that inmates receive constitutionally adequate care." *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015) (citation omitted). As such, nurses may be held liable for ignoring obvious risks to an inmate's health in following a physician's orders. *See Holloway v. Delaware Cnty. Sheriff,* 700 F.3d 1063, 1074 (7th Cir. 2012). While mere disagreement with a medical professional's course of treatment does not establish that the course of treatment was objectively unreasonable or deliberately indifferent, *Williams v. Ortiz*, 937 F.3d 936, 944 (7th Cir. 2019), "[a] substantial departure from accepted professional judgment, practice, or standards," a failure to abide by an existing protocol, or a failure to follow a specialist's recommendation can support a reasonable inference of deliberate indifference. *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (citation omitted); *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016); *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 660 (7th Cir. 2021).

8

In addition, "[a] delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain." *Perez*, 792 F.3d at 777–78 (citations omitted). The tolerability of the delay "depends upon the seriousness of the condition and the ease of providing treatment." *Id.* at 778 (citation omitted). "Even brief, unexplained delays in treatment may constitute deliberate indifference." *Lewis v. McLean*, 864 F.3d 556, 563–64 (7th Cir. 2017) (citations omitted) (holding that a reasonable jury could conclude that defendants exhibited deliberate indifference by delaying the prisoner's treatment for his muscle spasm and severe back pain for 1.5 hours). To demonstrate an unconstitutional delay, a plaintiff must present "verifying medical evidence" that the defendant's delay in rendering or obtaining medical assistance, rather than the plaintiff's underlying medical condition, caused harm; and expert testimony to that effect satisfies this requirement. *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007).

Here, there is ample evidence from which a reasonable jury could find that Defendants' conduct was objectively unreasonable, including verifying medical evidence tending to show that Heth suffered harm from a delay in treatment. First, Heth has adduced evidence that Nurse Clapp and Dr. Elazegui failed to comply with existing protocol as established by Correct Care. Specifically, it is undisputed that the COWS protocol form states that a patient should be scheduled for a session with a healthcare provider on the next clinic day or sent to the emergency room if the next clinic day is more than 24 hours later. (DRPSAF ¶ 16; Defs.' Statement of Facts ("DSF"), Ex. B, Heth Medical Records at 000053, Dkt. No. 134-2.) Additionally, the form directs staff to cease COWS monitoring if the patient's COWS scores remain below 12 for 6 scores or for 72 hours. (DRPSAF ¶ 18; Heth Medical Records at 000053.) Yet, in this case, Jail nursing staff did not schedule Heth for a visit with a physician on the next clinic day or send him to the emergency room, even though his COWS scores were 16 and 18 on May 26 and May 30,

9

respectively. (DRPSAF ¶¶ 19–20, 22–24.) While Heth's COWS score decreased to 2 on May 31, Dr. Elazegui and Nurse Clapp removed Heth from the COWS protocol on June 1—despite his COWS scores not falling under 12 for 6 scores or for 72 hours. (DRPSAF ¶ 26; PRDSF ¶ 11.) Dr. Elazegui's and Nurse Clapp's testimony that they exercised their professional judgment and removed Heth from the COWS protocol due to his normal vital signs and lack of withdrawal symptoms only to establish the existence of a dispute of fact as to whether their care decision was a matter of professional judgment or deliberate indifference. (*See* DSF, Ex. A, Clapp Dep. 45:5–8, 64:24–65:5, 67:21–68:6, 69:4–10, Dkt. No. 134-1; DSF, Ex. D, Elazegui Dep. 16:4–17:23, Dkt. No. 134-4.)

Second, Heth points to verifying medical evidence that Nurse Clapp's and Dr. Fatoki's 5.5-hour delay in sending him to the emergency room on June 2 harmed him. On the morning of June 2, Nurse Clapp observed that Heth had extensive open wounds, could not identify the time and place, had rapid and slurred speech, had unequal pupil size, and was hallucinating. (DRPSAF ¶ 29; PRDSF ¶ 14.) Heth's expert, Dr. Goyal, opines that Heth's symptoms were signs of septicemia, and that Heth's septicemia was related to his wounds. (DSF, Ex. J, Goyal Report at 7, Dkt. No. 134-10; DSF, Ex. M, Goyal Dep. 77:13–18, Dkt. No. 134-13.) Further, Dr. Goyal concludes that Heth would not have required endotracheal intubation and an extended stay in the hospital's intensive care unit if Dr. Fatoki and Nurse Clapp had sent him to the hospital earlier. (Goyal Dep. 75:21–76:10, 79:9–17; Goyal Report at 7.)

It is true that Defendants' expert, Dr. Fowlkes, opines that the emergency department's initial diagnosis of sepsis was incorrect, that substance abuse caused Heth's condition on June 2, that the delay in sending Heth to the hospital did not impact the outcome of Heth's condition, and that excess air in Heth's peritoneal cavity (as opposed to a delay in medical treatment, sepsis, or

10

his wounds) caused Heth's intubation. (DSF, Ex. F, Fowlkes Dep. 17:1–18:1, 30:13–21, Dkt. No. 134-6; DSF, Ex. G, Fowlkes Report at 25–26, Dkt. No. 134-7.) But that disagreement in the expert testimony merely demonstrates the need for a factfinder to determine how much weight and credibility to afford each expert's testimony, thereby creating a factual dispute that precludes summary judgment. *See Godinez v. City of Chicago*, No. 16-CV-07344, 2019 WL 5597190, at *2 (N.D. Ill. Oct. 30, 2019) (denying defendants' summary judgment motion because of the parties' conflicting expert testimony regarding the decedent's cause of death); *cf. Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009) (noting that a "battle of the experts" requires "the factfinder to determine what weight and credibility to give the testimony of each expert and physician").

Third, Heth has presented evidence that Defendants substantially departed from accepted professional standards of care. Again, there is conflicting expert testimony on this issue. On the one hand, Dr. Fowlkes opines that Defendants' conduct was reasonable, appropriate, and within the acceptable standard of care. (Fowlkes Report at 22, 27.) For example, Dr. Fowlkes finds that the Jail's medical staff provided Heth with appropriate wound care and monitoring, and that Dr. Elazegui and Nurse Clapp appropriately removed Heth from the COWS protocol once his acute withdrawal subsided. (*Id.* at 23–24, 27.) In addition, Dr. Fowlkes states that the standard of care did not mandate that Dr. Fatoki and Nurse Clapp send Heth to the emergency room on the morning of June 2, given that Heth's symptoms were consistent with substance abuse and that Dr. Fatoki subsequently ordered Jail staff to closely monitor Heth. (Fowlkes Dep. 16:1–20, 20:3–12, 37:5–14; Fowlkes Report at 27.) Likewise, Nurse Wild opines that Defendants' conduct satisfied reasonable and acceptable practices of care, that Nurse Clapp and Dr. Elazegui properly removed Heth from the COWS protocol once he had progressed through the withdrawal period, and that medical staff appropriately sent Heth to the hospital on the afternoon of June 2 when his clinical

presentation changed. (DSF, Ex. H, Wild Dep. 25:20–27:7, Dkt. No. 134-8; DSF, Ex. I, Wild Report at 10, 12–13, Dkt. No. 134-9.) Moreover, Nurse Wild concludes that it was appropriate for Nurse Clapp to use her clinical judgment to deviate from the COWS protocol and decline to send Heth to the emergency room after his COWS scores exceeded 12. (Wild Dep. 20:13–21:21; Wild Report at 12.)

Meanwhile, Heth's expert, Dr. Goyal, opines that Defendants' medical care "failed to meet [a] reasonable standard of clinical competence." (Goyal Report at 8.) As to Dr. Elazegui, Dr. Goyal concludes that the decision to remove Heth from medical observation was a "conscious decision to deviate from [the] standard of care," in light of Heth's susceptibility to infection, worsening wounds, and deteriorating mental health. (*Id.* at 7.) With respect to Dr. Fatoki, Dr. Goyal also posits that Dr. Fatoki consciously disregarded a known serious risk by ignoring "the red flags of septicemia" and delaying transferring Heth to the emergency room for over 5 hours. (*Id.*) Similarly, Nurse Panosky opines that Nurse Clapp's course of treatment fell below the standard of care of a reasonable and prudent nurse, and that her actions "caused or contributed harm to Mr. Heth's worsening medical condition." (DSF, Ex. K, Panosky Report at 2, 10, Dkt. No. 134-11.) For instance, Nurse Panosky finds that Nurse Clapp's failure to send Heth to the emergency room or schedule Heth for an appointment with a physician following his COWS score of 16 and 18 violated company protocols and was unacceptable. (*Id.* at 7, 10.) Nurse Panosky also concludes that Nurse Clapp's removal of Heth from the COWS protocol was unacceptable because the protocol required Heth to remain on the protocol until his COWS scores were below 12 for at least 6 scores or 72 hours. (*Id.* at 8.) Further, Nurse Panosky opines that Nurse Clapp's failure to send Heth to the hospital on the morning of June 2, despite his emergent symptoms, was also unacceptable. (*Id.* at 8–9.)

In sum, the record evidence and, in particular, the conflicting expert testimony create a genuine issue of material fact regarding the objective reasonableness of Defendants' actions sufficient to preclude summary judgment. Accordingly, Defendants' motion for summary judgment on Heth's deliberate indifference claim is denied.

## II. Punitive Damages

Finally, Defendants contend that if the Court denies their motion for summary judgment regarding the merits of Heth's Fourteenth Amendment claim, the Court should nonetheless find that punitive damages are unwarranted as matter of law. Specifically, Defendants argue that there is no evidence that their conduct meets the criteria for a jury to award punitive damages.

Punitive damages may be awarded in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Green v. Howser*, 942 F.3d 772, 781 (7th Cir. 2019) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). The standard for punitive damages for a § 1983 claim is the same as the standard for liability: "both require a determination that the defendants acted with deliberate indifference or reckless disregard." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 930 (7th Cir. 2004) (quoting *Walsh v. Mellas*, 837 F.2d 789, 801 (7th Cir. 1988)). The same evidence summarized above that would allow a reasonable jury to conclude that Defendants acted with deliberate indifference toward Heth likewise establishes a genuine issue of fact as to whether Defendants were sufficiently reckless or callous as to warrant punitive damages. *See Morris v. Obaisi,* No. 17-CV-05939, 2023 WL 2745508, at *8 (N.D. Ill. Mar. 31, 2023). Therefore, summary judgment is denied as to punitive damages as well.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 132) is denied.

ENTERED:

Dated: September 25, 2023

_____
Andrea R. Wood
United States District Judge